IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-44 |
| YANIV GOLA | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, J. Jeanette Kang, Assistant United States Attorney for the District, hereby files this sentencing memorandum. The defendant, Yaniv Gola, is scheduled to be sentenced on October 22, 2024. For the reasons explained below, the government asks this Court to sentence the defendant to a term of incarceration within the applicable Guidelines Range, that is, 21 – 27 months' incarceration, followed by three years of supervised release.

**I.     BACKGROUND**

On February 14, 2024, defendant Yaniv Gola pleaded guilty to all counts of the information, charging him eight counts of interstate communication of threats, in violation of 18 U.S.C. § 875(c). As part of the plea agreement, the parties stipulated that certain provisions of the Sentencing Guidelines Manual applied, and the defendant agreed to abandon his right, title and interest in three firearms and ammunition that were seized from his home during a premises search warrant execution.

From at least August 2, 2022 until November 5, 2023, defendant Yaniv Gola used a Voice over Internet Protocol ("VoIP") mobile application to disguise his phone number and make calls, in interstate commerce, that threatened to hurt, kill and rape eight different victims.

1

All of these victims were small business owners, and family members of small business owners. The defendant used antisemitic and Islamophobic slurs. All of the victims believed these threats were true threats. They feared for their safety and lives; they called the police and took additional measures to protect themselves.

    A.  <u>Victims R.G. and T.G. (Counts Two and Three)</u>

On June 14, 2023, at approximately 1:33 p.m., the defendant used a VoIP mobile application to mask his phone number and call R.G.'s business phone number. R.G. owns a business in the Eastern District of Pennsylvania. R.G. answered, and the defendant said, "You fucking Jew, now I know where you are. I'm going to kill all you Jews … you Jews are all so greedy. You all should be shoved back into ovens. … I'm going down to [*R.G.'s business location*] to kill you."

On the next day, June 15, 2023, the defendant continued to call R.G.'s business line and made threatening statements. One of these calls threatened to rape victim T.G., who is R.G.'s parent. Specifically, the defendant said, "How's [T.G.] doing? We love [T.G.]. We're going to rape [T.G.]." Then, the defendant named T.G.'s home address, and said, "We're on our way. Have a good day!" The defendant also said to R.G., "What kind of Jew do you think you are? You're disgusting … You guys are destroyers. Disgusting, thieving destroyers. Horrific. [*R.G.'s home address*]. See you soon. Sleep tight, bitch." PSR, ¶ 16.

The defendant made approximately 27 calls to R.G.'s business phone between June 14 and June 15, 2023, and 12 calls to R.G.'s personal cell phone between June 15 and June 19, 2023. The defendant made 13 calls to T.G.'s personal cell phone on June 15, 2023.

    B.  <u>Victim M.R. (Count Four)</u>

On June 15, 2023, the defendant used a VoIP mobile application to call victim M.R.,

who is R.G.'s sibling. While M.R. did not recognize the phone number, M.R. answered because the call was made to the phone number she used for her business. When M.R. picked up the phone, the defendant said that he knew who she was, and then said, "I'm going to stick a dildo up your vagina and split it in two." This call frightened M.R., who feared for her safety. Records from the VoIP provider reflected that the defendant made seven calls to M.R.'s phone on June 15 and June 17, 2023.

    C. <u>Victim R.K. (Count Five)</u>

On June 16, 2023, the defendant used a VoIP mobile application to call victim R.K.'s phone that he used for business. R.K. owns a business in the Eastern District of Pennsylvania. The defendant said to R.K., "I want to put a bullet in your head … You fucking Muslims." The defendant continued to use Islamophobic slurs and other derogatory language to R.K., including referring to R.K. as a "dot head," which is an ethnic slur used against people from the Middle East and/or South Asia. The defendant also told R.K. that he knew where R.K. lived. Records from the VoIP provider reflected that the defendant made 39 calls to R.K.'s business phone between June 16 and June 27, 2023.

    D. <u>Victim W.G. (Count Six)</u>

Starting June 29, 2023, the defendant used a VoIP mobile application to call victim W.G.'s business phone and personal phone. W.G. owns a business in South New Jersey. On June 29, 2023, the defendant called W.G.'s business, and W.G. picked up. The defendant used antisemitic slurs, like the word "kike," and threatened W.G., "bitch, call the police, this is a threat … we're going to cave in your skull with a baseball bat." The defendant made 87 calls to W.G.'s business phone between June 29 and August 3, 2023, and 24 calls to W.G.'s cell phone between July 1 and July 26, 2023.

E.  <u>Victims G.M., N.K. and D.M. (Counts One, Seven and Eight)</u>

Starting in 2022, businesses where victims G.M., N.K. and D.M. worked received hundreds of phone calls from various phone numbers threatening to injure them, and using antisemitic slurs.

On August 2, 2022, the defendant used a VoIP mobile application to call a business location where G.M. worked. G.M. answered, and the defendant said to G.M., "You better be careful, little bitch … you better be careful. We know where you live. And of course we know where you are … you better be careful. There is nothing you can do about it. Or the police. … I would be very careful. You don't know who we are, but we know who you are, and we have your address. … Take it as a joke bitch … because you're not going to be laughing. … We know your address. And the police can't help you. And this is a threat. So go ahead and call the police. I would like to talk to the police right now. … You're not going to be laughing when we're done with you. So go ahead, keep going, keep talking."

Then, on September 30, 2023, the defendant called a business where victim N.K. worked. N.K. answered, and the defendant threatened, "I will come kill you, you better watch your back."

On November 5, 2023, the defendant called the business where D.M. worked. D.M. answered, and the defendant said, "You're Jewish, I'm from Hamas. You're animals and pigs. … If you don't leave that place, we're going to blow you up."

The defendant made hundreds of calls to these three business locations where G.M., N.K. and D.M. worked. The defendant made seven calls to one business location between July 30 and August 3, 2022; 115 calls to a second business location between July 30 and September 28, 2022; and 467 calls to the third business location between September 21, 2022, and November 7, 2023.

## II. SENTENCING GUIDELINES CALCULATION

### A. Statutory Maximum Sentence

The Court may impose the following statutory maximum sentence for interstate communication of threats: five years' imprisonment, three years of supervised release, a $250,000 fine, and a $100 special assessment.

In total, the defendant faces a statutory maximum sentence of 40 years' imprisonment, three years of supervised release, a $2,000,000 fine and a $800 special assessment.

### B. Sentencing Guidelines Calculation

The government agrees with the U.S. Probation Office's calculation of the applicable Sentencing Guidelines (*see* PSR ¶¶ 46-101), which calculated each count as a "group" with an offense level of 12, per USSG § 2A6.1(a)(1). Each group included a two-level upward adjustment under USSG § 2A6.1(b)(2)(A) because the defendant made more than two threats to each victim. Applying the three-level downward adjustment for acceptance, under USSG §§ 3E1.1(a) and 3E1.1(b), the total offense level is 16. The defendant's Criminal History Category is I. PSR ¶ 104. This results in a Guidelines Range of 21-27 months' incarceration. PSR ¶ 153.

## III. CONSIDERATION OF THE 3553(a) FACTORS

The Supreme Court has declared, "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

The Court must consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a), in determining the appropriate sentence in this case. The Section 3553(a) factors include: (1) the

5

nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1] Restitution is not an issue in this case.

For the reasons stated below, a sentence within the applicable Guidelines Range, followed by three years of supervised release, is appropriate in this case.

### A. The nature and circumstances of the offense.

For well over a year, the defendant terrorized eight people. He called his victims—who were all small business owners—on their business lines and on their personal cell phones, and threatened to hurt and kill them. He called his victims' family members. He threatened to rape one victim's parent, and threatened to commit horrific sexually violent acts on the same victim's sibling. He learned where his victims lived and worked, and used this information in his threats. He used brutal, vile and hateful language that he knew would trigger a particular kind of fear in

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quoting *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

his victims, who were Jewish and Muslim.

All eight victims truly believed that their lives, and the lives of their family members and employees, were in imminent danger. Each of these victims took substantial measures to protect themselves, including staying away from their homes, having their children stay with relatives, walking around their homes with a kitchen knife to make sure it was safe, changing their phone number, installing additional security cameras, and obtaining a firearm. All eight victims called the police, and officers from the Philadelphia Police Department, Newtown Square Police Department, Media Borough Police Department, and the Haddonfield Borough Police Department responded and patrolled the vicinity.

The government has provided to the Court copies of Victim Impact Statements provided by some of the defendant's victims. These statements detail the fear that the defendant's actions caused. Victim R.G. wrote, "I feared that my own home and family were no longer safe. … Just when I thought things couldn't get any worse … The caller now branched out even further, terrorizing other members of my family. … No one should ever have to experience the series of events this person put me and my family through. This was not just some prank. This individual threatened to kill and rape people and created a situation where my family and staff couldn't even go home or to work without the fear of something horrific occurring." R.G.'s parent, T.G., wrote, "It was extremely upsetting to me … to learn the defendant knew about our entire family, where we lived, and phone numbers. Calls to 'kill and rape all Jews,' plus the most frightening for me, was the defendant told my son that 'I will rape your mother.' … [I] [d]rove home, so upset, shaking, looking in my rear-view mirror constantly, fearing I might be followed. … The toll this defendant took on myself and my family, was total, anxiety, stress and fear! No one should have to go through this frightening experience that we all had to endure!!"

Victim W.G. wrote that "[f]or many weeks my staff and I were on high alert and suffered a lot of anxiety. Sleep was almost impossible and I often checked my doors and windows during the nighttime. Because of Mr. Gola's threats I didn't go many places without an escort or, at the very least, without scoping the area before I stepped into or out of my vehicle, business, or home. … As time progressed I learned to deal with the constant 'fight or flight' feeling that the calls produced. No person should have to learn to live with that. As far as I'm concerned this person should receive no leniency or shortened time."

The Court should also consider the sheer number of calls this defendant made to his victims—he called and texted his victims' business and personal phones *hundreds* of times. U.S. Probation has advised that this may be grounds for an upward departure. PSR ¶ 167. The government does not move the Court for an upward departure at this time, however, the Court should consider this fact as a strong indicator that a sentence that is below or at the bottom of the Guidelines Range is not appropriate in this case.

The defendant was relentless, and he was intentional. The defendant *wanted* his victims to feel fear, *wanted* to disrupt their lives, and *wanted* to cause psychological damage to this community—and by committing these crimes, he got exactly what he wanted. The defendant must be punished for what he has done to his victims and this community. Regardless of whether he intended to act out on his threats, he instilled real fear and trauma in his victims. And he did this without remorse for years. A substantial prison sentence, that is within the Guidelines Range, is warranted in this case.

B. **History and characteristics of the defendant.**

The defendant grew up in a stable family environment, and reported no history of abuse or neglect. He had full-time employment. The government acknowledges the PSR's discussion

of the defendant's mental health, but submits that the defendant does not have any diagnoses that appear to impair his ability to understand right from wrong. He also does not have any serious or chronic physical illnesses. Thus, there are no mitigating facts related to the defendant's background and characteristics that call for a sentence that is below or even at the bottom of the Guidelines Range in this case. In fact, the defendant was raised in the Jewish religion, which means he understood the harm that his antisemitic words caused to his Jewish victims, as well as the harm that his Islamophobic language caused his victim who is Muslim. Despite knowing this, he continued to engage in this conduct, demonstrating that he had no remorse until he was caught by the FBI. The defendant is deserving of a significant sentence within the Guidelines Range.

The government submits, however, the defendant did quickly accept responsibility for his actions. After he pleaded guilty, the defendant agreed to meet with the FBI to discuss how he engaged in this conduct to help the FBI better understand other like-minded offenders. This is a reason the government seeks a sentence within the Guidelines Range, and does not request an upward variance or departure.

## C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

The defendant committed a serious offense. There is no doubt that the defendant traumatized eight individuals, and caused real harm. The defendant's threat to victim W.G., "bitch, call the police," is evidence that he believed he could get away with this crime. A sentence within the Guidelines Range will reflect the seriousness of the offense, will promote respect for the law and will provide just punishment for the offense.

## D. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

A substantial sentence that is within the Guidelines Range is necessary to deter not only

this defendant but other, like-minded defendants who would commit this type of offense. In this increasingly cyber world, threats made over the internet or using a cell phone are pervasive. These threats have real world consequences for its victims, who suffer psychological harms. Law enforcement agents take threats like this seriously, not only because of the damage and fear they cause their recipients, but also because of the possibility that these threats may morph into reality. A sentence that is within the Guidelines Range will help serve the goal of general deterrence, and further the message that law enforcement and the courts take threats seriously.

> **E. The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need to adjust the sentence to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The defendant has not reported any physical health concerns, and the Bureau of Prisons is equipped to address his mental health concerns.

> **F. The guidelines and policy statements issued by the Sentencing Commission and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Under 18 U.S.C. § 3553(a)(6), the Court "shall consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." While the Sentencing Guidelines are advisory, they remain the sole means available of assuring some measure of uniformity in sentencing. Reference to the Guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. A sentence at that is within the Sentencing Guidelines range will help avoid disparities in sentencing by ensuring that the defendant's sentence is consistent with that of other defendants convicted of similar offenses.

## IV. CONCLUSION

Based on the foregoing, the government asks that the Court sentence the defendant within the Guidelines Range, that is, a sentence within 21 – 27 months' incarceration, followed by three years of supervised release. This sentence will serve all of the purposes of sentencing and all of the factors set forth in § 3553(a).

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s/ J. Jeanette Kang*
J. JEANETTE KANG
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the Government's Sentencing Memorandum has been served upon the below attorney via e-mail:

David Bahuriak, Esq. (counsel for defendant)

/s/ J. Jeanette Kang
J. JEANETTE KANG
Assistant United States Attorney

Date: October 15, 2024